Good morning, Your Honor. I'm Mary Hudson. I'm representing the Pacific Coast Federation of Fishermen's Associations, the San Francisco Crab Boat Owners, and the Port Orford Ocean Resources Team. Together, these people represent over 1,000 fishing families in California, Oregon, and Washington, and some of them are here today. We do want to reserve five minutes for rebuttal. This is a case of first impression on the 2007 amendments to the Magnuson-Stevens Act that authorized individual fishing quota programs. The program at issue here is a market-based, hands-off reformation of this major fishery. It abandons fishery management through ongoing adjustments responsive to changing circumstances and replaces it with a system of long-term fixed shares in the fishery. Well, let's just jump right into it because basically you've got MSA claims and then you've got NEPA claims. Right. And if we jump to the, regarding the MSA, I read Section 1853AC as requiring NEMS to consider, I'm going to emphasize that word, consider fishing communities when fashioning a quota program, not guarantee them particular type of level of participation. What specific language in the statute mandates that NEMS, one, allocate quota shares to fishing communities, two, limit shares to those who substantially participate in the fishery, or three, otherwise provide a specific role? And then this is sort of how I'd like you to address things. And why aren't your arguments at base a disagreement with the balance that NEMS struck between competing objectives? So if you can kind of answer those questions for me on your MSA claims. That's a big order. All right. Let me start with your first one about the fishing communities. There are really two kinds of requirements for fishing communities. One is to make it not to give them allocations per se, but to make it possible for them to qualify to get allocations. So you don't read consider to equal mandate, or you do? I'll get to the consider part of it in a minute. The first one doesn't, the first requirement which deals with making it possible for them to participate involves NEMS adopting criteria that would then be used as the basis for a so-called community sustainability plan. They would show they qualify. They have a plan how to fish sustainably long-term. Those criteria were not adopted, so the community's efforts were thwarted. They couldn't, they didn't have a chance to get allocations. The other requirement actually does require NEMS to do something beyond just adopting the criteria. It requires them to provide for communities in a variety of ways, and you ask where that takes place in statute. The section that is called allocations, which is C-5, has a number of requirements for the making of allocations. And it doesn't just tell NEMS to consider these things. It tells them to adopt procedures and policies which themselves give consideration to communities. And the requirements are quite detailed, as you can see. They involve things like having port-specific landing requirements and delivery requirements, like taking into account the historic participation of fishing communities. I mentioned, I think, in the brief, the recent decision of the Northern District Court in the Pacific Dawn case. And that case, although different, turned on some of the same language. And the Court there found that the requirement to adopt procedures which give consideration to some of these factors, in that case it was recent participation in the fishery, that that requirement had to be met. They couldn't just ignore it. They couldn't just say, we've considered it because we thought about it, or even because we held a hearing on it. The procedures and policies themselves have to embody the consideration. Does that answer your question? Okay, well, obviously your clients ended up on the short end of the stick here. So that didn't work out well for them. But how does that mean that they didn't consider? I think the District Court, you know, probably said they could have approached this differently. They could have made different determinations. You know, they could have come to different conclusions that might have been more beneficial to your clients. But they didn't. And the District Court said, I cannot substitute my judgment for their judgment. So you have to show more. You have to show more than just they reached a different decision. So that's one of the issues in these types of cases. It's a fairly high standard and a fairly high level of deference that they get as long as you pretty much have to show that they, you know, something that they really did wrong. Well, you're right. The District Court, in fact, did say there's no evidence in the record connecting up the conclusion reached with the facts they had in front of them and with the law. But this use of the term consider is markedly different than it is elsewhere in the Magnuson Act. The national standards, for example, tell the agency to consider this, consider that, consider, you know, communities, consider fishing history, consider a lot of things. This says consider the basic cultural and social framework by adopting measures and by development of policies. Where are you reading from? I'm reading from 5A and B. And C, as a matter of fact. B and C in particular are act they're worded to be action-forcing. Include measures to assist. If you look at the introductory phrase, it says the counsel and secretary shall then, skip to C, include measures to insist, to assist. So this isn't the usual. Well, when necessary and appropriate. Right. And if it's not necessary and appropriate, they need to explain why. Now, there was a huge amount of testimony before the counsel in papers and submittals about why it was necessary and appropriate. None of it got dealt with. It was just simply ignored. So the linkage between the outcome and the evidence presented to them is missing. All right. If that deals sufficiently with that question, I'll go on to the next part of your question that had to do with the substantially participate language. Sure. Limit shares to those who substantially participate in the fishery. Right. Again, we're under section C, but this time we're under C-5e. And it just says authorize, which, I mean, to me, that doesn't mandate that only those who substantially participate. That's the way they read it. And so we have a response to that. Well, if there's two ways to read it, who wins? There aren't really two ways to read it. Okay. And so if there are two ways to read it, they win, don't they? So you have to ‑‑ your argument has to be that there are not two ways to read it. Right. The background to this is that during the development of this legislation, there was great uncertainty about whether the Magnuson-Stevens Act had adequate authority for communities to hold quota. That's discussed in a number of places, including the National Research Council report that Congress called up on IFQs. And the National Research Council report said something like, there is a question there. We're not sure there is authority, so you should amend the statute to make it clear that there is authority for communities to hold quota. And that's what happened. It's discussed quite a bit in the NRC report, and I think we've cited to that in our brief. So what happens ‑‑ But you're basically arguing that the plain ‑‑ well, the plain language orders NIMS to consider fishing communities in fashioning a limited access program. And their position is it does not require NIMS to allocate initial fishing privileges or quota shares to fishing communities, or to establish participation criteria that enables communities to receive an allocation of such privileges. Now, if you look at the legislative history, it seems to, in keeping with the MSA requirements, you've got Amendments 20 and 21, and they talk about mitigation impacts to fishing communities, and it seems that that sort of supports the fact that some people are, it's not going to come out, you know, that it isn't going to mandate them receiving what they want. The statute does not mandate allocation of quota to every fishing community. It does not, and we don't claim that. Okay. It mandates making it possible for the communities to qualify, to show that they qualify. Remember, we haven't discussed this so much, but remember one of the requirements for the program is that those who hold quota must be those who substantially participate in the fishery. A community has to show that it is, that it has a history of participation in this fishery. And it has to show also under these rules that it has a program for sustainable fishing over time. So those two requirements have to be met once they are met, and they are dependent on the criteria that the agency was supposed to develop. Once they are met, then they are supposed to participate in the allocations. But to go back to the question of who is eligible, the eligibility sections are those included under the entitlement of allocation. And it's very clear that Congress wanted those who substantially participate to be the ones who receive quota. So they authorize the agency to give quota to those ones. The question of what happens after the quota has been allocated first, and now it comes time to transfer it. So there's a specific question about, there's a specific provision about transfer of quota. And it says that the rules for transfer of quota have to be specific with that Section C-5e. I have a question to ask you just in terms of, and I'm going to ask it of the other side as well. Are you involved in a number of these type of cases? And are these type of challenges being made regularly to the MSA? On the IFU question in particular? Will the language consider and what, you know, what that, you know, in terms of the? No, no. I'm just wondering in terms of if this Court were, is there a necessity to publish in this area if these kind of claims are coming up regularly? No. As far as we know, this is a case of first impression on the issues that we're raising here. There have been three pieces of litigation under this new legislation. There was one in the Gulf Coast, one in New England, and the one in the Northern District that I mentioned, which had a rather narrow focus having to do with who gets allocation. The one in the Gulf Coast was based on a claim that the provision in the statute for the fishermen. I don't want to take a lot of your time here. Are you saying you don't think this merits publication or? Oh, is that the question?  Yes, I do. I do think. This case and the way that we're raising it goes to some of the most basic policies in the management of fisheries. And I think the outcome of this case is going to be felt in the management of fisheries and the policies reached all across the country for years to come. Okay. That was my question. Yeah. I know you want to reserve time. Do you want to deal with your NEPA claims at this time? Well, I would really like to finish up on the eligibility issue. All right. Well, you can use your time the way that you want. I would like to finish up on the eligibility issue because it's central. As you read through the legislative history, you see the very substantial intent to keep fishing power in the hands of people who fish, not in the hands of people who might make investments and be absentee owners. So the legislation itself and its background both very clearly limit the ownership and the use to those who substantially participate. The section that NEMS has relied on as a definition for eligibility is actually a prohibition against non-citizens owning quota and having shares. This goes back to the origins of the Magnuson Act, which started out as an effort to keep foreign-owned vessels out of our waters. But that doesn't You're at your five minutes. Do you want to reserve? I guess I should. Can I just ask one question in terms of the substantial participant argument that you made? Yeah. Section 1853A directs the NMFS to include measures to assist when necessary and appropriate entry-level owners, operators, et cetera. And that would seem to suggest that somebody who is an entry-level has not been a substantial participant. Yeah, that's a good question. There's an answer to that. The statute does make provision for assistance to entry-level people, and also the whole idea of having communities be participants and hold quota includes the idea of enabling newcomers to get their quota through leasing by the community, the community association's whole quota. They lease it out to whoever wants to fish, and this can include newcomers. The chance of a new entrant in a fishery being able to purchase the necessary trawl permit, which is before the IFQ program they were going for $600,000, the chance of them being able to or even being interested in entering at that level is, you know, nil. Much more likely they would start out as a crew member, and they would therefore become a substantial participant. Thank you. All right. Before we start the clock, I just have a question. Are you the government lawyer? Yes, Your Honor. All right. Now, I noticed on the calendar, I just want to, you're allowing five minutes to amici? That's correct, Your Honor. All right. But you're going to speak first? Correct, for 15 minutes. Okay. All right. Basically, unless we're having questions and we want to keep you longer, then I'm going to cut you off at 15 so that you'll have five minutes, and you don't need to sit at the table stressing out over, because I know that sometimes people, they lose track of time. So I'll do that. Okay. We can start the clock now. Please state your name and your appearance. Very well. Brian Toth from the Department of Justice, representing the Secretary of Commerce and other federal defendants. With me at counsel table is Tim Hobbs, representing the Environmental Defense Fund and other amici curiae. And I will speak for 15 minutes, as I just mentioned. Okay. So just the amici is going to get up, and I'm assuming support your position in a certain point. But are they going to agree with the plaintiffs that NIMS didn't adequately study whether Amendments 20 and 21 may cause adverse habitat impacts? No, they are not going to agree with that. Okay. I'll just wait and hear what they're going to say. Although, yes, we'll see. All right. To get something out of the way, first of all, the Trawl Rationalization Program that the Secretary of Commerce approved here does not exclude communities from participating by holding quota. It did not allocate separate quota as an initial matter to communities, unless, of course, they had participated in the fishery by owning a trawl permit, and then they would have received initial allocations of quota, like any other fisherman who owned a trawl permit. Well, it does seem clear from the statute and the legislative history that fishing communities are a big concern. And I guess the issue then would be, and I think that this is what the plaintiffs are alleging, did NIMS give them short shrift in Amendments 20 and 21? Why didn't NIMS establish eligibility criteria for fishing communities? Well, NIMS sees that provision, I think it's C3, pertaining to fishing communities. I mean, fishing communities is a defined term under the Act, and that's not the only way that a community can participate in the program. So NIMS sees that as a way of allowing fishing communities to participate, a way that's discretionary. If NIMS decides to promulgate criteria that enable communities to submit a community sustainability plan, they might be able to participate in the program on terms that are different from other participants. So, for example, in the EIS here for Amendment 20, which is the trawl program, NIMS mentioned that through this adaptive management program, where it's set aside 10 percent of the total quota shares for non-whiting, it's going to consider in several years what to do with that. And one of the possibilities is that it will allow communities, fishing communities to participate in ways that the current participants can't. Is there really any assurance that the adaptive management program and other features to protect fishing communities will actually work? Well, it's adaptive. There's no assurance of that, but it's intended to adapt to effects that were not foreseen at the time the program was adopted. So there is that flexibility built in that's both, you know, it creates uncertainty right now as to whether it's going to be adequate to take care of all the impacts, but it's also flexible enough to be crafted and tailored to whatever impacts materialize in the first few years of the program. The provision in C5A regarding allocation of initial shares does provide only that the Secretary of Commerce shall consider the current and historical participation of fishing communities in establishing initial allocations. And that was met here through the extensive analysis in the EIS. They considered whether communities had any interest in obtaining initial allocations, and the record, as far as the EIS concluded, demonstrated that communities had not voiced concerns early in the process that they wanted an initial share and that they wanted to go through this different procedure. So what would someone have to, more than just disagreement with your ultimate decision, what would someone have to show to show you did not consider? I mean, if I were making your argument, I'd say they want this Court to interpret consider to mean mandate. Right. But consider has to mean something. Well, it means the ordinary APA standard of review from the State Farm and this Court's case in McNair, that basically the agency has to demonstrate a rational connection between the facts made and the facts found in the record. And it's done that here extensively through its record of decision for both amendments and through the extensive EISs that are part of the record. It has to show, it has to meet the arbitrary and capricious standard of the APA, which is a high, very deferential standard. I asked a plaintiff's counsel, appellant's counsel, about whether if this Court, is there utility to publishing in this area? What is, you know, is this a recurring issue? Is this something that, I'm not telling, you know, obviously people only want you to publish when they win. But that aside, there's a publication standard that's separate and apart. Is this something that should be a published opinion? I defer to the Court on that. I can give you a little bit of guidance. I mean, these cases, we do get these cases. They're not as frequent as other cases. You'll see under NEPA, for example, involving agencies like the Forest Service. The Magnuson Act is a very complicated statute. It's a unique statute in the role that it assigns for counsels, and basically developing the initial proposed action, and then the Secretary of Commerce, also a Federal agency, approving the action of the counsel. So it's kind of sui generis. We don't see a lot of these cases. I haven't, I'm not aware of any other challenges that deal with this specific language. There's a case in the First Circuit that's pending involving issues in this realm of law, but not the precise same issues. This is one of, you know, this is the major fishery, one of a couple major fisheries in the Ninth Circuit, the other being the one up in Alaska, which has been dealing with IFQ issues for a while now. So I defer to the Court, but I don't know that this is a real widespread problem here. Regarding the NEPA challenges, our independent utility test for connected actions asks whether two actions would proceed without each other, not whether they could. So is there anything in the record to show that Amendments 20 and 21 would proceed independently? That's a, I can't think of anything in particular right now showing that they, they would, well, you know, they were developed around the same time. The processes were contemporaneous and Well, did I miss state the standard? No, I think it does look theoretically at whether they can, whether it would be rational. I mean, the Court's case in the Wetlands Action Network and some of the other cases we cited in our brief look at whether it would be rational for one to proceed without the other. That's one of the tests. And I think that is one that is hypothesis, the Court hypothesizing whether one could proceed in the absence of the other, not necessarily whether it, in fact, would, because you really wouldn't know that unless one was stopped cold, which didn't occur here. Well, do the two amendments have independent utility? They do. Yes. How so? Well, the trial program could rely on the process that had already been going on to harvest among the different sectors for different species. What Amendment 21 did was simply fix that allocation in a plan amendment a little more permanently for a longer period of time so that that allocation won't change every two years, it will just change whenever the plan is next amendment, amended. And they're going to go back and look at that in five years. But that's, you know, that certainly helped the trial rationalization program in creating greater predictability for people who buy these privileges. They'll have a better idea that they're going to have an allocation that extends more than just a couple of years, so they'll have a better idea of what the price ought to be. Certainly that helps the trial program function better. But it didn't have to be the case. There could be less economic efficiency, but it would still function with the biennial allocation that was always proceeding before Amendment 21. Similarly, Amendment 21, you know, while it complemented the trial program, it simply could have been used to simplify the agency's decision-making process and avoid this two-year process where they're always reevaluating the reallocation. They didn't need the trial program in order to fix those allocations. And it is a very — I'm getting mired in the details here, but it is a very complicated regulatory action. I mean, one point to take away on the — some of the issues as to affect some communities is this Court's decision in the Alliance Against IFQs v. Brown case that we cited in our — in our brief makes clear that it's permissible under the Magnuson Act for the Secretary of Commerce to adopt an IFQ program that benefits the fishery overall despite having some effects on limited discrete groups. The goals of the trial rationalization program here were to attend to economic problems that were inherent in the fishery. There was a declaration of economic disaster 12 years ago by the Secretary of Commerce because the — Kagan. Economic considerations were pretty heavy here. Feigin. Yes. But the second major area was biological problems with the fishery. And they're tied to the economic problems because the fishermen want to be able to fully — well, the Secretary of Commerce wants to be able to enable the fishermen to use the full allocation of their harvest in a way that economically sustains the community and basically best uses the resources. But the problem is that the bycatch, when fishermen would target certain species, they would catch other fish species they didn't intend to catch, and those species ended up being the ones overfished. But the vessels were not monitored 100 percent. Only about 20 percent of the trial vessels were monitored. So it's expensive to monitor for bycatch. That's part of it. Another part is that you didn't have individual accountability that you do with the individual fishing quotas that are now in place. Now you have quotas assigned to individual fishermen tied to specific vessels where NIMS can track what each vessel is taking in, and with the monitors on board, they can track the bycatch as well. That helps the conservation, and it also helps the people who were just scraping by before to improve their economics because it will give people incentives to fish more efficiently because if you have excess quota, even if it's quota for a fish that's regarded as bycatch or discard, you can sell it for revenue, or you could use it to harvest when you can't harvest the bycatch, obviously the overfished fish. But you could sell it to people who don't have enough quota that are not perhaps as efficient. The result in the long term is that, you know, the people who are more efficient fishermen are going to win out over the people perhaps who are smaller businesses, not as sophisticated. But that's the scheme that's allowed by the statute. And it is important to take into account the effects to communities, but the service has done that here through the various mechanisms that are in place, setting aside the – sorry, I didn't want to – Was NIMS required to study every reasonable alternative or just a range of reasonable alternatives? What's your best case? Because the Ninth Circuit seems to have a little bit of conflicting dicta on this point. Right. I mean, this is – it's required to study a range of reasonable alternatives. And what's reasonable? There are a lot of different ways to say an alternative is not reasonable. It could be not reasonable because it doesn't meet the agency's policy goals or doesn't further the purpose and need of the project, as some of the alternatives did here. If they don't fully further the purpose and need, they don't need to be identified or they don't need to be analyzed in detail. The important thing, I think, is for the alternatives that are not analyzed in detail, the agency has to provide an explanation of why it did not analyze them in detail. And here you have a couple appendices, Appendix A and Appendix F to the EIS, that include a very detailed description, if you will, of why they were not including these alternatives in the body of the EIS. And I think that goes much further than many of these other cases in the agency providing the explanation of why it wasn't going to consider more than the six or seven alternatives that it did. So I think they satisfied NEPA there. And the regulation that allows the agency to simply provide the explanation is 40 CFR 1502.14a. It says that the agency must only briefly discuss the reasons for eliminating alternatives from detailed consideration. So for a number of these alternatives, they simply were not manageable and would not go far enough toward the economic efficiency goals and didn't have countervailing conservation benefits that would have outweighed those economic efficiency goals. So I think the explanations that IMSS has provided in the record are adequate to satisfy that regulation. Unless the Court has any further questions. Can you stop the clock for just a second? Did you start it at 20? Oh, okay. So, all right. I'll open to so you have one minute and 25 seconds left, but whatever, you can start it again. I'll open that to the judges for questions if they have any additional questions. They don't appear to. So do you want to see the balance of the time to your? Yes, Your Honor. Amiki? Thank you. Okay, why don't you stop it while it's, don't count as walking time. Walk faster. You're losing time. This is the Olympics to the podium. Thank you, Your Honor. May it please the Court, my name is Tim Hobbs, and I represent not only the Environmental Defense Fund, but also two fishing industry organizations, the United Catcher Boats and the Midwater Trawlers Cooperative. My clients are a coalition of fishing industry and environmental interests that support this program because of the economic benefits it will generate and because of the conservation improvements that will result to the fishery. So do you agree with the plaintiffs that NIMS didn't adequately study whether Amendments 20 and 21 may cause adverse habitat effects? Not at all. We completely disagree with the appellants, and we fully support the government's position. We think that the agency undertook a rigorous examination of the habitat impacts that could potentially result from this program and found that the impacts were likely to be minimal compared to the status quo, given that trawling is the predominant gear type that's used in the fishery. Well, so do the people that you represent, are they a little bit in conflict as to what they want? No, and I think that's a unique thing to point out here, Your Honor, is that all three of my clients participated for five to seven years in developing this program. They attended every single meeting of the council and worked out every painstaking detail, and all three groups fully support this program. And I think that's a testament to the achievements that this program has the potential to create and that both industry and environmental groups support this program because it will advance, it will improve the economics of the fishery and enhance fisheries conservation. Well, it didn't work out too well for these plaintiffs. So is it your position then that there are always going to be some plaintiffs that it doesn't work out too well for, but that doesn't necessarily mean that there are either that they haven't read the MSA correctly or that they haven't complied with NEPA? That's right, Your Honor. The national standard guidelines that implement the national standards here contemplate that in any allocation scheme there are bound to be winners and losers, and I think that's the unfortunate reality of the management process. Here we have a very unique system where stakeholders can participate through these regional councils and make their voices heard, and then, you know, the ultimate decision is submitted to the Secretary of Commerce for approval. So I think, you know, there is a way for various views of stakeholders to be taken into account, but the ultimate decision has to be made, and sometimes that's going to result in winners and sometimes it would result in losers. So what do you read the word consider to mean? I think the word consider means exactly what the council and the agency did in this process, and that means to look at potential impacts that were likely to happen to fishing communities and to determine whether or not the impact or the measures they included in the plan would address those impacts. Here for fishing communities in particular, a number of elements were added to the plan specifically to protect fishing communities. Those include the adaptive management program, accumulation limits that would limit the amount of quota any particular person could acquire, limits on transferability of quota in the first couple of years, allocations to processors in various communities of whiting in order to encourage fishing fleets to stay in those areas. And I would note, too, that, you know, fishing communities have always participated in the fisheries by virtue of those that are based in those communities that own vessels and go out and catch fish and bring them back and land them in those communities. And I think under this current system, that's how communities will continue to participate. If a community wants to acquire quota in the future, a community can do that under the transferability rules. Once the moratorium is lifted, quota can be transferred to a wide variety of individuals and entities. Well, what's your view on the amendments 20 and 21, whether, you know, I'm reading the language to say that they would proceed with that to each other as opposed to could. So what's your reading of that and whether the plaintiffs are contending that separate EISs were necessary? I do not, we do not believe separate EISs were necessary here because the amendments could have proceeded independently. Here they proceeded coextensively for a period of time. They were initiated at different periods of time. But ultimately they were approved under the same Federal Register notice that was promulgated by the agency. But I think the independent utility test uses the word would, not could. That's right. And I think here the And you use the word could. That's right, Your Honor. I think, you know, the question here is that if Amendment 20 established a rationalization program under which a portion of the quota was then subdivided amongst the participants in the trawl fishery. Amendment 21 had a fundamentally different purpose. And so I think the question has to be here whether or not the amendments could have proceeded independently. The basis for preparing an EIS is to look at, you know, the range of alternatives that is considered for a particular management plan. And here these two plans had completely different purposes. One, as I said, one was to allocate fish amongst the trawl sector. And the other was to do intersector allocations where fish would be allocated between the trawl sectors and the other sectors. And so it would have made sense to analyze them under a comprehensive EIS, given the separate purposes that each of these two amendments had. Now they happened to be implemented ultimately at the same time. And I think there were benefits to that. But that doesn't mean that they did not have independent utility and that separate EISs weren't appropriate. Do any of the judges have any questions? All right. We have 17 seconds to wrap up. Thank you. I think that concludes our remarks. Thank you, Your Honor. All right. Thank you. I have five minutes. You have three minutes and 12 seconds. Let me start with this question of independent utility. The not only do does Amendment 21 say repeatedly that it is closely connected to the other amendment and is needed in order to implement the other amendment, in discussing the alternatives, it says, the no-action alternative is not a viable option if the trawl rationalization program is implemented. This is exactly the rationale on which this Court rejected the for-service dual EISs when they had a sale of timber on the one EIS and a road accessing the timber in the other, and said that the no-action alternative is not a possibility because we have to have the access to the timber. The case was Thomas v. Peterson, Ninth Circuit, in 1985. This is a facial concession that 20 needs 21. It can't go forward without it. Let me just go back. I don't follow that point, though. I mean, I heard the language you read, but in my mind, at least, the two amendments do have independent utility. If only one had been enacted, there would have been benefits that would have flowed from that. The Amendment 20, well, first of all, the Amendment 20 can't do it. It just sits there without any use until there are allocations. Amendment 21 makes the allocations, but they're not your ordinary allocations. They are fixed long-term shares, per se, on their face. So if you didn't have 20, 21 would be useless. If you don't have 21, 20 is also frozen and useless. Okay? Scalia. Can I ask you what? I don't purport to be an expert. Kagan. Pardon me? I don't purport to be an expert on NEPA. What is the practical consequence? So they considered it not separately. What bad thing happened? The practical consequence is that you divide up a project in two parts and do two different EISs, and you can't tell when you're interested that both the public and the decision-maker can't get a look at the whole project and what its impacts are. I'll give you an example. Well, I think it's isn't your argument that it's a way to dilute the actual impact? In fact, if you did it in one, there would be more impact, and they would have to do – it might require more mitigation. It could take – you could make it look more alternatives. Or if you cut things up into too many pieces, then you could say this doesn't have an impact, this doesn't, this doesn't, this doesn't. But if you put them all together, it might. That's part of it. But it's also that you as the commenter or the decision-maker don't have the whole picture in front of you. There's a shell game going on in which the comment that you might want to make about 20 really applies to 21, and the comment you might want to make about 21 applied to 20, and the comment period is closed and you can't get a fix on it. I want to address some of the other issues here. The monitoring program, we have no objection to the fact that there is a monitoring program. It's clearly an environmental plus. However, it doesn't have to have an entire trawl rationalization program to exist. There was a monitoring program before, and it could continue. There was an argument put out that we had to have trawl rationalization to pay for the monitoring program, but actually the Federal Government. What I'm hearing you say, though, there, is they could have done it differently, but they didn't. That's not enough to say they didn't comply. No, I'm not saying that there's no compliance question with the monitoring program. It's a good thing, okay? I only want to make the point it can exist without the trawl rationalization program. It did once and it could again, and they can also use electronic monitoring, which is a great deal less expensive. But I guess what I'm saying is, yes, they could have gone that way. They had that choice, but they didn't. So, but that doesn't mean you win. No, but one of the things it does mean is that the one and only environmental plus ingredient in this project, in this whole program, is not essential to it and is really more in the nature of a sweetener. This program is entirely about economic efficiency. I recommend that you go to the EIS on Amendment 20 and take a look at page 6 through 8, which explains the theory of tradable shares and how it drives the whole program. This is entirely an economics program. Essentially, you're two minutes sober. Unless any of the judges have any other questions, that will conclude. But if they do, please feel free. It appears there are no further questions. I thank you both for your argument in this matter. This matter will stand submitted. This Court is in recess until tomorrow morning at 9. Thank you. All rise.
judges: Korman, Callahan, Watford